
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 18, 2017 at Knoxville

**STATE OF TENNESSEE v. GARRY BAKER**

**Appeal from the Circuit Court for Rutherford County**
**No. F-72659      David M. Bragg, Judge**

---

**No. M2016-01164-CCA-R3-CD**

---

The Defendant, Garry Baker, was convicted by a Rutherford County Circuit Court jury of attempt to commit voluntary manslaughter, a Class D felony, and two counts of aggravated assault, Class C felonies. *See* T.C.A. §§ 39-13-211 (2014), 39-12-101 (2014), 39-13-102 (2014). The trial court merged the convictions into a single count of aggravated assault and sentenced the Defendant as a Range II, multiple offender to eight years to be served consecutively to a previously imposed sentence. On appeal, the Defendant contends that the trial court erred (1) by permitting the State to introduce evidence of his previous conviction and (2) by imposing consecutive service. We reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Melton, District Public Defender, and John Driver, Assistant Public Defender, for the appellant, Garry Baker.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Jennings H. Jones, District Attorney General; and Dana Minor and Matthew Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This cases relates to a domestic disturbance involving the Defendant and his stepfather, Dale Ernsberger, who sustained cuts to his arm and neck from a knife during an altercation. At the trial, Rutherford County Sheriff's Detective Jason Dowdle testified that when he arrived at the victim's home on August 15, 2014, the victim had already been taken

to the hospital. He identified photographs of the scene, which included, in relevant part, the carport area where the incident occurred, the victim's wife's car reflecting a red substance on the driver's side door, a red substance on the driveway, and red substances on a paper towel and the deck.

Detective Dowdle identified additional photographs, which depicted the victim at the hospital. The photographs reflect a laceration to the victim's right forearm, wounds to his left and right hands, a laceration to the left side of his neck, and a wound to his back. Detective Dowdle identified two additional photographs taken approximately five days after the incident, which reflect sutures and bruises on and around the victim's neck and forearm. Detective Dowdle identified a photograph taken inside the Defendant's bedroom at the victim's home, which reflects a red folding knife. Detective Dowdle said that the victim identified the knife as the one used to inflict his injuries.

Detective Dowdle identified photographs of the Defendant taken at the time of the incident. The photographs reflect two small lacerations on the Defendant's chin and a red area on the Defendant's forearm. Detective Dowdle said the Defendant stated that the injuries were inflicted during the incident.

On cross-examination, Detective Dowdle testified that the Defendant was inside the home when he arrived at the scene, that he did not question the Defendant, and that he spoke to Ms. Hicks, who was the victim's wife and the Defendant's mother. Detective Dowdle said Ms. Hicks denied witnessing the physical altercation but admitted she heard the victim and the Defendant arguing outside the home. Detective Dowdle identified a photograph showing black tire markings in the driveway and said the witness statements showed that the Defendant arrived at the victim's home, causing the tire markings, just before the altercation. Detective Dowdle agreed he did not know when the markings were made. He said he did not submit any of the evidence for DNA analysis or analyze the red substances found at the scene to determine if they were blood.

Detective Dowdle testified that the Defendant did not mention during his police interview that he sustained injuries to his head but that the Defendant described himself as "a cripple." Detective Dowdle said that he did not speak to the Defendant after the interview and did not look at the Defendant's injuries after the date of the incident. Detective Dowdle stated that he took photographs of ten prescription medication bottles found inside the Defendant's bedroom. Detective Dowdle said that the knife was not analyzed for fingerprints or DNA evidence and was found on a television stand in plain view. He said the victim described the knife to Detective Tillman when the victim was at the hospital.

On redirect examination, Detective Dowdle testified that the victim was the only person who was bleeding at the scene and that nobody questioned whether the red substances

were blood or whether the blood belonged to the victim. Relative to the knife, Detective Dowdle said that nobody questioned who had inflicted the victim's injuries.

Brenda Hicks, the victim's wife and the Defendant's mother, testified that she was age seventy-two, that the incident in this case occurred at her home, and that she lived with the victim and the Defendant before the incident. She said that on the day of the incident, the Defendant and the victim were home, that the Defendant left before lunchtime with the family dog, and that the Defendant returned home around 1:00 p.m. She said that she called the Defendant while he was gone and that she left a voicemail message requesting him to bring home the dog. She said the Defendant returned her call and accused her of stealing his pain medication. She said she hung up because she knew "he was after a fuss."

Ms. Hicks testified that the Defendant slammed his brakes when he returned home, that the victim was outside finishing yard work, and that she heard the Defendant accuse the victim of stealing the Defendant's pain medication. She said that she called the police when the Defendant raised his voice and reported a "domestic violence case" and that she warned the Defendant she was calling the police. She said the Defendant walked inside the home, stopped in the kitchen for a drink, and went to his bedroom. She said that she saw the victim walking toward the home, that she saw blood coming from the victim's chest and arm, and that she used paper towels to stop the bleeding before the police arrived.

Ms. Hicks testified that the wheelchair ramp leading to the home was built for the Defendant, although the Defendant was not using a wheelchair, walker, or cane on the day of the incident.

On cross-examination, Ms. Hicks testified that the Defendant began living with her and the victim on May 10, 2010, and that the Defendant and the victim did not always get along. She said that after the Defendant accused the victim of taking the medication, the victim attempted to talk to the Defendant. She agreed she did not witness the physical altercation, although she knew the Defendant was "looking for a fight" when he raised his voice.

The victim testified that he was age eighty-one and that on the day of the incident, the Defendant returned home not long after the victim had finished mowing the lawn. The victim said that the Defendant backed his truck into the driveway quickly, almost hitting another vehicle and the carport supports. The victim said that he asked the Defendant for the dog leash and collar, that the Defendant became upset, and that they argued. The victim said that the Defendant accused him of stealing medication from the Defendant's truck, that the victim and the Defendant stood nose-to-nose, that the Defendant screamed, and that the victim placed his hands on the Defendant's chest and asked the Defendant to back away. The victim said the Defendant stepped back and cut the victim's arm with a knife. The

victim said that after he saw he had been cut, he attempted to hit the Defendant but missed, that he walked toward the home, and that the Defendant cut the victim's jaw and neck with the knife.

The victim testified that he shoved the Defendant after the Defendant cut his jaw and neck and that the Defendant struck the carport frame, knocking items from the Defendant's hand. The victim said that he began walking toward the home but decided to return to the driveway, that Ms. Hicks placed paper towels on his wounds to stop the bleeding, and that the police arrived shortly afterward.

The victim testified that an ambulance took him to the hospital, that the medical staff sutured his arm but sent him to another hospital for a surgical consultation for the neck wound. He said that an ambulance took him to the second hospital, that he received several injections of medication, and that he stayed overnight for observation.

The victim testified that he told the Defendant that he did not need the Defendant's pain medication because he had his own medication. The victim noted that he and the Defendant were prescribed the same medication and dosage from the same doctor, and the victim said that he had arthritis in his back. He said that he was attempting to get away from the Defendant when the Defendant cut his neck.

On cross-examination, the victim testified that he thought he had finished the yard work around noon, that the Defendant returned home around 1:00 or 1:30 p.m., and that he had washed the mower between noon and the Defendant's arrival. He said that the Defendant had the dog but that the victim did not know the Defendant had taken the dog when the Defendant left. The victim denied seeing the dog get out of the Defendant's truck but said the Defendant admitted having the dog leash and collar. The victim denied hitting the Defendant but admitted attempting to hit the Defendant after the Defendant cut the victim's arm. The victim denied attempting to hit the Defendant before the Defendant cut the victim's arm. The victim denied testifying at the preliminary hearing that he struck the Defendant before the Defendant cut the victim's arm.

The victim testified that the Defendant held the knife in his left hand and a drink and cigarettes in his right hand during the incident. The victim denied the Defendant said he was going to kill the victim. The victim said that he was not waiting for the Defendant to arrive home. The victim did not know how the Defendant sustained the small cuts to his chin and denied striking the Defendant's arm. He admitted he placed his fingers on the Defendant before the Defendant cut him twice. The victim said that he was released from the hospital after one night and that he did not require additional medical treatment.

On cross-examination, the victim testified that after he received the cut to his arm he became afraid of the Defendant and that he was "really scared" after the cut to his neck

because he thought the Defendant would cut him again. He did not know how much blood he lost but said he thought the doctors and "the good Lord" kept him from dying.

The Defendant testified that on the day of the incident, he left home in his truck to pay bills without the family dog. He said he paid a couple of bills with his Social Security disability income, which he had received since 1992. He said that since 2010, he had three major surgeries and explained a myriad of health issues.

The Defendant testified that while he was gone from home, he received a voicemail message from his mother. He said that he returned her call after he was unable to find his morphine and hydrocodone medication inside his truck. He said that the victim and Ms. Hicks were the only people who had access to his truck and that he always locked his truck. The Defendant agreed that the victim was prescribed some type of pain medication but said the victim's medication was weaker than his medication. The Defendant said that Ms. Hicks did not ask about the family dog when he returned her call.

The Defendant testified that when he returned home, he backed up the driveway a little too fast and caused skid marks when he pressed the brakes. He said that he did not see the victim until the victim stood at his truck door, that the victim yelled he did not take the Defendant's pain medication, and that after the Defendant left the truck, the victim yelled about the dog leash. The Defendant recalled that he held several items in his hands, including a drink, a cell phone, keys, and cigarettes. He said that when he attempted to leave, the victim struck his jaw with a fist and that the Defendant did not remember anything afterward. The Defendant said the marks on his chin in the photograph previously identified were the result of the victim's hitting him. The Defendant denied striking the victim and said he attempted to get away from the victim because the Defendant did not want a confrontation. He noted that the victim had struck him before this incident and that Ms. Hicks had treated the Defendant's wounds. The Defendant said that he lived at the home because he had nowhere else to stay.

The Defendant testified that he did not know whether he inflicted the victim's injuries because he did not remember anything after the victim struck him. He said he told the police that he did not remember what occurred after the victim hit him and agreed the police did not ask him questions about the knife. He admitted that the knife belonged to him and that he often carried it. He did not dispute that his knife was used to cause the victim's injuries but said he never attempted to hurt the victim. He said that he "slashed at" the victim because the victim attempted to hurt him. The Defendant said he was scared of the victim's temper.

The Defendant testified that he did not see the victim before he left home that morning and that he was upset his medication was gone when he returned home. He agreed that although he did not see the victim or Ms. Hicks take his medication, he believed they

had the opportunity to take it. The Defendant said that he hated that the victim was hurt, that he had not tried to hurt the victim, that the victim tried to hurt him, and that the victim had hurt him previously.

On cross-examination, the Defendant testified that he might have screamed at Ms. Hicks on the telephone about his missing pain medication, but he denied telling Ms. Hicks that he would "take care of it" when he arrived home. He said he knew some of the medication was missing because he had refilled the prescriptions three or four days before the incident. He said the majority of his pills were gone. He agreed the rain guard on his truck disappeared about three weeks or one month before the incident but said nobody broke into his truck to take his medication because he kept it locked.

The Defendant testified that he did not say anything to the victim before the victim hit him because he did not want to start an argument and because the victim was screaming at him. He said he did not remember swinging the knife at the victim or whether the victim grabbed him. He said that his rotator cuffs were torn, that he had difficulty moving his arms above his head, and that he experienced pain with side-to-side movements and when he swung his arms. He said he could have torn his rotator cuffs in 1999 or 2000, when he defended himself during an attempted robbery. He denied defending himself with a knife during that incident.

The Defendant testified that he was convicted of aggravated assault in 2006. He said that in August of 2013, he and the victim fought, that the victim pushed him, that the Defendant went to his room, and that the victim entered his room and pushed him again. The Defendant denied using a knife during the incident, although he admitted thinking about grabbing a nearby knife. He said that he protected himself during the incident and that he might have eventually grabbed the knife had the victim not stopped hitting him. He agreed that he would use a knife to defend himself if he thought someone would hurt him. He said that his mother called the police and that the police could not determine the primary aggressor.

Detective Dowdle testified during the State's rebuttal proof that he interviewed the Defendant after the incident and identified the video recording of the interview, which was played for the jury. Detective Dowdle said that during the interview, the Defendant stated that he called Ms. Hicks to discuss someone breaking into his truck, that the victim "got in" the Defendant's face when he arrived home, that the victim screamed at him, and that he told the victim not to place the victim's hands on him. Detective Dowdle said that the Defendant reported a "back and forth" with the victim, that the Defendant said the victim struck him, and that the Defendant indicated the victim hit him on the side of the head with a "roundhouse" punch. Detective Dowdle said that the Defendant reported reaching into his pocket, pulling out the knife, and cutting the victim after the victim punched him. Detective

Dowdle said that the Defendant said he was angry and that the red area on his arm contained blood blisters caused by the victim. Detective Dowdle said that the Defendant stated that he cut the victim but that the Defendant later said he did not know whether he cut the victim with the knife. Detective Dowdle said that the Defendant was told about the victim's injuries and that the Defendant repeatedly said he retaliated when the victim attacked him.

On cross-examination, Detective Dowdle testified that the Defendant never stated that he went looking for or "hunted down" the victim or that he wanted to fight the victim. Detective Dowdle agreed the Defendant's first statement was that he was defending himself from the victim. Detective Dowdle said that the Defendant never said during the interview that he was going to kill or hated the victim and that the Defendant only reported the victim was dangerous. Detective Dowdle agreed that based upon the Defendant's interview, he investigated previous domestic-related incidents involving the Defendant and the victim, that previous police reports showed "domestic situations," and that no arrests were made during those incidents. He said that the Defendant's and the victim's statements conflicted, that the responding officers could not determine the primary aggressor, and that as a result, no arrests were made. Detective Dowdle later conceded that the Defendant's and the victim's statements conflicted regarding the present incident, as well. Detective Dowdle stated that he had no reason to think the Defendant had lied about his disabilities and physical ailments.

Upon this evidence, the jury found the Defendant guilty of attempt to commit voluntary manslaughter and two counts of aggravated assault, and the trial court merged the convictions into a single count of aggravated assault. This appeal followed.

As a preliminary matter, the State contends that the Defendant has waived appellate review of his issues because he failed to cite to the record and to legal authority supporting his arguments. The Defendant neither cites to the record in his brief nor does he cite to legal authority supporting his arguments. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on." The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" Tenn. Ct. Crim. App. R. 10(b). Notwithstanding the deficiency in the Defendant's brief, we will consider his issues. We caution counsel, however, that appellate review is frustrated by the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected.

## I.     The Defendant's Previous Conviction

The Defendant contends that the trial court erred by permitting the State to introduce evidence of his previous aggravated assault conviction. He argues that his direct examination testimony did not "trigger" or "open the door" to the admission of evidence of

his previous conviction pursuant to Rule of Evidence 404, that the offense was not a crime of dishonesty, and that the prejudicial effect outweighed any probative value. The State argues that the trial court did not err by allowing the introduction of the previous conviction for impeachment purposes.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Tennessee Rule of Evidence 404(a)(1) states generally, "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . [i]n a criminal case, . . . evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same[.]" Tennessee Rule of Evidence 404(a)(2) states generally, "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . [i]n a criminal case, . . . evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused[.]" Generally, this provision is used to present evidence of the victim's previous history of violence to show that the victim was the first aggressor. *See, e.g., State v. Ruane*, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[5][f] (6th ed. 2011).

The Defendant testified on direct examination that when he arrived home, the victim yelled at him, that he attempted to leave, and that the victim hit the Defendant's face with a fist. The Defendant said that he attempted to get away from the victim because he did not want a confrontation, that the victim had struck and injured him previously, and that his mother had treated his previous injuries. The Defendant stated that he did not attempt to hurt the victim, that the victim attempted to hurt him, that he was scared of the victim's temper, and that the victim had hurt him previously.

Before the prosecutor began his cross-examination, he requested a jury-out hearing. The prosecutor informed the trial court that he had provided the defense with notice of the State's intent to use the Defendant's 2006 aggravated assault conviction as impeachment evidence and requested permission to question the Defendant about the conviction. The

prosecutor did not provide information regarding the circumstances of the conviction or the parties involved in the incident. Trial counsel responded that that the probative value of the conviction was outweighed by the danger of unfair prejudice. Counsel, though, conceded that it was proper for the State to question the Defendant, the victim, and Ms. Hicks about the previous incidents referenced during the Defendant's direct examination. Counsel stated that he and the prosecutor were aware of the previous incidents. We note that no references were made to any rule of evidence as a basis for admitting or excluding evidence of the conviction and that the record is unclear whether the prosecutor and counsel were discussing the same rule of evidence.

The prosecutor referenced an August 16, 2013 domestic violence report in which the Defendant, the victim, and Ms. Hicks provided statements to the police. The prosecutor stated that he should be able to introduce the Defendant's statement relative to this altercation. Trial counsel did not object and stated that the defense would recall the victim and Ms. Hicks to testify about the incident if the State introduced the report and the Defendant's statement. The prosecutor stated, "Judge, just for clarification, 404, . . . now that [the Defendant] has opened the door for character for violence, . . . the questioning can come in as well through these statements and his prior conviction[.]"

The trial court found that an issue existed regarding whether the Defendant or the victim was the initial aggressor based upon the Defendant's direct examination testimony. The court found that as a result, the State was permitted to "introduce evidence to contradict or concerning the character of [the victim]." Relative to the Defendant's conviction, the court only found that the State was permitted to question the Defendant about the conviction and that the conviction was "more probative than prejudicial."

As a preliminary matter, the State argues in its brief that the trial court properly admitted evidence of the Defendant's previous conviction because the conviction was offered for "impeachment purposes." The record reflects that the prosecutor initially advised the trial court that he had provided the defense notice of its intent to impeach the Defendant with his aggravated assault conviction and requested permission to question the Defendant about it. Although the prosecutor did not explicitly state the rule of evidence upon which he was relying, his limited statement implies that the State sought admission of the convictions pursuant to Rule 609 relative to impeachment by evidence of a criminal conviction. *See* Tenn. R. Evid. 609(a)(3) (stating that in order to impeach a criminal defendant with a previous conviction, the State must provide notice of the conviction before the trial and that the trial court must upon request determine whether the conviction's probative value outweighs any unfair prejudice). We note that the trial court's findings relative to the admissibility of the conviction were only that the probative value of the conviction outweighed any prejudicial effect. We also note that the trial court did not provide a jury instruction relative to evidence of a prior conviction for impeachment purposes pursuant to

Rule 609. *See* T.P.I—Crim 42.07 (19th ed. 2015). However, just before the court's ruling on the motion, the prosecutor stated, "Judge, just for clarification, 404, . . . now that [the Defendant] has opened the door for character for violence, . . . the questioning can come in as well through these statements and his prior conviction[.]" This statement shows that admission of the conviction was sought based upon Rule 404(a) because the Defendant testified that the victim was the initial aggressor. Although the State's argument in its brief focuses on Rule 404(a), we will address the admissibility of the conviction pursuant to Rules 404(a) and 609(a)(3).

Tennessee Rule of Evidence 404(a) governs the admissibility of evidence related to a person's character or trait of character for the purpose of proving action in conformity with the character trait on a particular occasion. To the extent that the State relies upon Rule 404(a) to support the admission of the conviction, the conviction would have been offered as substantive evidence to show the Defendant did not act peacefully on the day of the incident and that the Defendant acted in conformity with a character trait for violence. The State argues in its brief that the evidence was offered because the Defendant raised during his direct examination "the issue of his propensity for violence." In support of its argument, the State asserts that the Defendant presented himself as a "peaceful, somewhat fearful recipient of the victim's anger, forced into retaliation in order to protect himself" and that this testimony "opened the door" to present evidence of the Defendant's propensity for violence pursuant to Rule 404(a). We note that the prosecutor made little to no argument at the jury-out hearing in this regard.

In any event, the record reflects that the Defendant did not testify that he was a peaceful person. To the contrary, he testified that at the time of the incident, the victim was angry, yelled at him about medication and a dog leash, and hit him in the face with a fist. The Defendant testified that he attempted to get away from the victim, that he did not want a confrontation, that he was afraid of the victim based upon previous altercations, that he did not want to hurt the victim, and that he defended himself against the victim because the victim attempted to hurt him. This testimony does not equate to the Defendant's asserting that he was generally a peaceful person. This testimony reflects, if believed, that the Defendant did not initiate the present confrontation with the victim and was relevant to his claim of self-defense.

We conclude that the Defendant's testimony regarding his fear of the victim and brief reference to the previous altercations were not intended to show the Defendant's or the victim's characters for particular traits. *See* Tenn. R. Evid. 404(a)(1), (2). The testimony did not show that the Defendant was generally peaceful or that the victim acted in conformity with any alleged propensity for domestic assault or violence. Rather, the testimony was intended to show only the Defendant's state of mind at the time of the altercation. The Defendant was indicted for attempt to commit first degree murder and aggravated assault,

and he claimed he acted in self-defense. However, he was convicted of attempted voluntary manslaughter and aggravated assault, and his state of mind at the time of the incident was critical in determining his culpability, if any. As a result, Rule 404(a) is inapplicable. *See* Cohen, § 4.04[7][b] (stating that "[s]ince the accused is proving his or her own fear rather than an action by the victim, Rule 404(a), which deals with character evidence to prove action in conformity with that character, does not apply").

Although the Defendant's testimony generally referenced other incidents of domestic altercations with the victim, the Defendant did not testify that the victim was generally violent, did not provide an opinion regarding the victim's propensity for violence, and did not attempt to present any evidence related to the victim's alleged prior bad acts. *See* Tenn. R. Evid. 404(a)(2), 405. The Defendant, however, asserted that the victim was the initial aggressor in the present confrontation. Although Rule 404(a) can be utilized to present evidence of a victim's previous history for violence to show that the victim acted as the first aggressor in a particular incident, the Defendant did not present evidence of the victim's prior bad acts to establish that the victim acted in conformity with a character for violence on the day of the present altercation. *See Ruane*, 912 S.W.2d at 779; *see also* Cohen, § 4.04[5][f]. In fact, the record does not reflect that the Defendant sought to present any prior bad act of the victim showing the victim was violent and therefore acted violently toward the Defendant on the day of the incident. The purpose behind Rule 404(a)(2) is to present evidence of a victim's prior bad act or character trait to show that the victim acted in conformity with the prior bad act at the time of the incident. No such evidence was presented by the defense.

The Defendant, however, testified regarding the sequence of events of the present confrontation, asserted his conduct was based upon self-defense because the victim initiated the violent altercation, and provided some background for his fear of the victim. Because of the Defendant's brief testimony explaining his fear of the victim, the State was entitled to question the Defendant about any previous altercations to which the Defendant alluded during his direct examination. We note that trial counsel conceded at the jury-out hearing that the State was entitled to question the Defendant accordingly, and the State questioned the Defendant on cross-examination about an August 2013 incident.

In order for the Defendant to establish self-defense, he was required to show, in relevant part, that he had a reasonable belief that an imminent danger of death or serious bodily injury existed, that the danger creating his belief was real or honestly believed to have been real at the time of the incident, and that his belief was reasonable. *See* T.C.A. § 39-11-611(b)(2)(A)-(C) (2014). The evidence related to the previous domestic altercations established a basis for the Defendant's self-defense claim, and we note that the trial court provided a jury instruction on self-defense. The court also instructed the jury that any initial aggressor evidence offered by the Defendant could only be considered in the context of

determining whether the Defendant acted in self-defense and that the evidence could not be used to determine the Defendant's propensity to commit the present offenses. Because the Defendant did not raise the issue of his character for peacefulness by asserting the victim was the initial aggressor, we conclude that admission of the Defendant's previous conviction pursuant to Rule 404 was improper.

Furthermore, we also conclude that the conviction was also inadmissible pursuant to Tennessee Rule of Evidence 609. Rule 609(a)(3) states, in relevant part,

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
>
> . . .
>
> (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court on request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. *The court* may rule on the admissibility of such proof prior to the trial but in any event s*hall rule prior to the testimony of the accused*[.]

(emphasis added).

The record reflects that after the trial court ruled on the defense's motion for a judgment of acquittal, trial counsel advised the court that the Defendant had elected to testify. A hearing was held, during which counsel questioned the Defendant about his desire to testify. At the conclusion of the hearing, jury instructions were discussed before a brief recess. When the trial resumed, the Defendant's direct examination began. The jury-out hearing regarding the admission of the Defendant's previous aggravated assault conviction was not requested until after the Defendant's direct testimony ended. Rule 609 requires a trial court to rule on the admissibility of an impeaching conviction before the Defendant begins his testimony. *See* Tenn. R. Evid. 609(a)(3). The proper procedure was not followed, rendering the conviction inadmissible on this basis.

Furthermore, although the record reflects that the trial judge's findings were limited, our review of the record reflects the admission of the conviction was not harmless. In this

case, the ultimate factual issue was whether the Defendant's conduct was the result of self-defense. The victim testified that the Defendant was the aggressor, and the Defendant testified that the victim was the aggressor and that he acted in self-defense. Ms. Hicks did not observe who began the altercation, leaving the Defendant and the victim as the only witnesses to the incident. The Defendant was indicted for two counts of aggravated assault and attempted first degree murder. The admission of his previous aggravated assault conviction more probably than not affected the outcome of the trial by causing the jury to conclude that the Defendant was the aggressor in the present altercation because he had been previously convicted of aggravated assault. *See State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (stating that "[w]here an error is not of a constitutional variety, Tennessee law places the burden on the defendant . . . to demonstrate that the error more probably than not affected the judgment or would result in prejudice to the judicial process.") (internal citation and quotation marks omitted); *see also State v. Roberts*, 703 S.W.2d 146 (Tenn. 1986) (concluding admission of a six-year-old conviction for assault and battery was not harmless error during a trial for aggravated assault in which the issue was whether the defendant acted in self-defense); *see also State v. Parton*, 694 S.W.2d 299 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227 (Tenn. 1980).

In determining the admissibility of a defendant's previous conviction pursuant to Rule 609, a trial court must make findings relative to whether the probative value of the Defendant's credibility outweighs any unfair prejudicial effect on the substantive issues raised during the trial. *State v. Thompson*, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000). Therefore, a trial court "must analyze the relevance the impeaching conviction has to the issue of credibility," "explain [the relevance] on the record," and "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id*. (internal quotation marks and citations omitted); *see State v. Waller*, 118 S.W.3d 368 (Tenn. 2003); Cohen, § 6.09[10][c]. The record does not reflect that the trial court made the requisite findings pursuant to Rule 609. The impeaching conviction and two of the offenses for which the Defendant was on trial in the present case were each aggravated assault. Relative to credibility, violent crimes, such as aggravated assault, "might reflect on the moral character of a witness and therefore are not without probative value on credibility." Cohen, § 6.09[10][c]; *see State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (stating "felonies of a violent nature reflect on the moral character of a witness . . . [, and] this evidence is not usually without probative value"). However, "the link between [violent] crime and truthfulness is, at best, weak and the potential prejudice is significant." Cohen, § 6.09[10][c]; *see Long v. State*, 607 S.W.2d 482, 485-86 (Tenn. Crim. App. 1980) (stating crimes involving assaultive conduct might result from causes that have "little or no direct bearing on honesty or veracity"). Therefore, although the previous aggravated assault conviction might have had some probative value relative to the Defendant's credibility and the jury's ability to determine whether he acted in self-defense, the probative value was outweighed by the unfair prejudicial effect on the substantive issues.

Because we have concluded that the Defendant's previous aggravated assault conviction was inadmissible and that the error was not harmless, we reverse the judgments of the trial court and remand the case for a new trial. We will now review the Defendant's sentencing issue.

## II. Sentencing

The Defendant contends that the trial court abused its discretion by imposing consecutive service with his previously imposed sentence. He argues that his physical needs render consecutive service improper and that consecutive service renders his sentence excessive. The State responds that the trial court did not abuse its discretion in ordering consecutive service. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014). Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-

115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report was filed with the trial court. The report shows that the Defendant had previous convictions for aggravated assault, attempted aggravated sexual battery, a violation of community supervision for life, four counts of driving under the influence of an intoxicant, four counts of violating the driver's license law, an unspecified weapon-related offense, criminal trespass, resisting arrest, and traffic-related offenses.

The presentence report shows that at the time of the offenses in this case, the Defendant was serving a one-year sentence on supervised probation for violating the sex offender registration monitoring act and that a violation of probation warrant was issued on August 24, 2014, as a result of the charges in this case. The Defendant did not finish high school but reported obtaining his General Educational Development diploma and attending trade school. The Defendant reported fair mental health and poor physical health, and the report reflects the Defendant's many health-related problems, including a broken back as a result of an automobile accident, a stroke, diabetes, hypertension, blood clots, and a gunshot wound from the early 1980s. The report shows that the Defendant had a "troubled childhood," involving abuse and periods of living in foster care.

Gary Bentley, Jr., the Defendant's brother, testified that the jury did not have all of the information during the trial, that the Defendant was violent, and that the Defendant deserved the maximum sentence. Mr. Bentley noted the harm caused to the victim and the emotional stress the Defendant had caused Ms. Hicks and the victim since the incident. He said that he was not concerned about his safety should the Defendant be released but that he was concerned for the safety of the victim and Ms. Hicks. Mr. Bentley noted an altercation during which the Defendant broke three of Mr. Bentley's ribs and said he did not press charges against the Defendant. Mr. Bentley said that he had spent little time with the Defendant since the Defendant's release from prison four or five years before the hearing. On cross-examination, Mr. Bentley testified that he did not witness the incident in this case but that he arrived at the home before the victim was transported to the hospital.

Brenda Hicks, the Defendant's mother, testified that the Defendant should remain in jail. She said the Defendant had threatened her previously and recalled previously obtaining an order of protection against him. She said that in June before the August incident, she

began calling the Defendant's probation officer, who never answered the phone or returned her calls, in an effort to have the Defendant removed from her home. She said that the Defendant had a temper and that she was not supporting him anymore. She said that she did not know where the Defendant would live if released from confinement and that the Defendant would never be permitted to live with her.

On cross-examination, Ms. Hicks testified that she obtained an order of protection against the Defendant in 1992 or 1993. She said that the Defendant wrote her letters since the incident in this case and that she sent him a post card stating she was disposing of his belongings. She said she decided to wait for judicial approval before throwing away his belongings.

During the Defendant's allocution, he stated that he had been suffering since his arrest and that he needed care for his injured back and shoulders. He said, though, the jail medical staff would not provide treatment. He said that he had only attempted to protect himself from the victim and that the victim had shoved him seven or eight times previously.

The trial court stated that in determining the Defendant's sentence, it considered the trial and sentencing hearing evidence, the presentence report, the principles of sentencing, the parties' arguments at the sentencing hearing, the nature of the conduct involved, the evidence offered regarding enhancement and mitigating factors, information from the AOC, the Defendant's statement, and the Defendant's potential for rehabilitation. The trial court merged the convictions into a single count of aggravated assault resulting in serious bodily injury and found that the Defendant was a Range II, multiple offender.

The trial court found that no mitigating factors applied. *See* T.C.A. § 40-35-113 (2014). Relative to enhancement factors, the court found that factor (4) applied because the victim was particularly vulnerable because of his age and physical disability. *See id*. § 40-35-114(4) (2014) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"). The court found that factor (13) applied because at the time of the offense, the Defendant was serving a sentence on supervised probation. *See id*. § 40-35-114(13)(C) ("At the time of the felony was committed, . . . [the Defendant was] [r]eleased on probation[.]").

The trial court imposed an eight-year sentence in confinement and ordered the Defendant's sentence be served consecutively with a previously imposed sentence because the Defendant was released on probation when the present offenses were committed. *See id*. § 40-35-115(b)(6) (2014). The court found that an extended sentence was necessary to protect the public from the Defendant's further criminal conduct and that consecutive sentences reasonably related to the severity of the offenses in this case.

The trial court stated that in denying probation it had considered the presentence report's reflecting that the Defendant had an extensive criminal history. The court stated that the Defendant was unable to "function well" and suffered from physical disabilities and continuing discomfort as result of his health problems. The court found, though, that the Defendant's health was not a justification for violating the law and was not a reason to engage in assaultive conduct. The court stated that it had considered the witness testimony at the sentencing hearing and found that the Defendant's ability to "relate" to his family was not good.

The trial court found that the victim suffered serious injuries and that the Defendant failed to consider the potential impact his conduct might have on the victim. Relative to rehabilitation, the court found that the Defendant was a poor candidate for rehabilitation based upon his age, pattern of behavior, and inability to comply with the terms of previous release. The court found that a "great interest" in protecting society from the Defendant existed and that the Defendant had previous opportunities to conform his conduct based upon his numerous previous convictions. The court found that probation would depreciate the seriousness of the offense and that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses.

The record reflects that at the time of the offenses in this case, the Defendant was serving a sentence on supervised probation for violating the community supervision for life requirement imposed pursuant to his attempted aggravated sexual battery conviction. *See id.* § 39-13-526 (2014). As a result, the trial court ordered the eight-year sentence in the present case to be served consecutively to the sentence imposed for the community supervision for life violation conviction. Tennessee Code Annotated section 40-35-115(b)(6) permits a trial court to impose consecutive service when a defendant is sentenced for an offense committed while serving a sentence on probation. We note that the court found that consecutive service was necessary to protect the public from the Defendant's further criminal conduct and that consecutive service reasonably related to the severity of the offenses in this case. The court found that although Defendant's many health problems were legitimate, his health problems were not a justification for his criminal conduct. The court's imposition of consecutive service was permitted by our Sentencing Act and is not excessive. Therefore, we conclude that the trial court did not abuse its discretion by ordering consecutive service.

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court and remand the case for a new trial.

_____
ROBERT H. MONTGOMERY, JR., JUDGE